**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lon Fredrick Collier, | No. CV-18-01442-PHX-RCC (MSA) |
| Petitioner, | **REPORT AND RECOMMENDATION** |
| v. | |
| David Shinn, et al., | |
| Respondents. | |

Pending before the Court is Petitioner Lon Fredrick Collier's first amended petition for a writ of habeas corpus under 28 U.S.C. § 2254. In 2007, a jury convicted Collier of two counts of aggravated assault and nine counts of sexual conduct with a minor under fifteen years of age. Collier argues that his trial counsel was ineffective for not raising stronger objections to the admissibility of his confessions to law enforcement. Collier also argues that his Fifth and Fourteenth Amendment rights were violated when his coerced statements were admitted at trial. For the following reasons, the Court will recommend that the petition be denied.

## Factual and Procedural History

### I.    Assault Investigation

On March 3, 2004, Collier threw a pipe at his fourteen-year-old daughter, A.C., striking her in the face and breaking her nose. (Doc. 32-3 at 209.)[1] On March 5, A.C. reported the incident to school officials, who in turn contacted the Yuma County Sheriff's

---

[1]    Record citations refer to the page numbers generated by the Court's electronic filing system.

Office. (Doc. 32-2 at 95.) Sheriff's Deputy Isaac Almodova responded to the school and spoke with A.C. (*Id.* at 95–96.) Deputy Almodova then decided to speak with Collier, who was at work at his mother's clothing store. (*Id.* at 96.)

Deputy Almodova met Collier in a public area of the store and told him that they needed to speak about an incident. (*Id.* at 107.) For privacy, the two proceeded through the nonpublic backroom and outside the back door. (*Id.* at 97.) There, during a tape-recorded conversation, Collier confessed to throwing the pipe. (*Id.* at 98.) Deputy Almodova arrested Collier and, during the drive to a nearby substation, advised Collier of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). (*Id.* at 112–13.) Collier did not respond to the *Miranda* warnings. (*Id.* at 113.)

Collier's initial appearance took place on March 6. (Doc. 32-4 at 5.) During the hearing, he informed the court that he intended to hire private counsel. (*Id.*) He was then released on bail. (*Id.*)

**II.     Sexual Abuse Investigation**

After reporting the assault on March 5, A.C. ran away. (Doc. 32-3 at 209–10.) A few days later, A.C. told an acquaintance at a friend's house that Collier had been sexually abusing her. (*Id.* at 210.) The allegations were reported to Child Protective Services and the Yuma County Sheriff's Office. (*Id.*) On the evening of March 8, Sheriff's Deputy Anton Vasquez and Detective Guy Avenetti interviewed A.C. (Doc. 32-1 at 65–66.) After the interview, which lasted approximately two hours, Detective Avenetti decided to pick up Collier for questioning. (*Id.* at 97–98; Doc. 32-4 at 79–83.)

Detective Avenetti and four deputies arrived at Collier's home at around 1:00 a.m. on March 9. (Doc. 32-1 at 98.) Detective Avenetti said nothing to Collier about A.C.'s allegations of sexual abuse; he instead told Collier that they were investigating the March 3 assault. (*Id.* at 152–54.) Detective Avenetti requested that Collier accompany them back to a substation for questioning, and Collier agreed. (*Id.* at 98–99.) For safety reasons, Collier was handcuffed and transported in the back of a patrol vehicle. (*Id.* at 72–73.) At the substation, the handcuffs were removed, and Collier was placed in a small, windowless

interview room. (*Id.* at 79–80.)

The interrogation, which was video recorded, lasted approximately two hours and fifteen minutes. (*Id.* at 107.) Detective Avenetti began by questioning Collier about the March 3 assault and A.C.'s status as a runaway. (*Id.* at 103.) This line of questioning was not preceded by the recitation of *Miranda* warnings. (*Id.*) After about 40 minutes, Detective Avenetti advised Collier of his *Miranda* rights, and Collier waived them. (*Id.* at 104–05.) Detective Avenetti then, for the first time, raised the allegations of sexual abuse. (*Id.* at 106.) Collier initially denied the allegations, but he eventually confessed to having sexual intercourse with A.C. on a regular basis from January 2003 to February 2004. (*Id.* at 107–08; Doc. 32-3 at 210.)

III.    **Trial Court Proceedings and Direct Appeal**

Collier was charged with two counts of aggravated assault in one case and with ten counts of sexual conduct with a minor in another. (Doc. 32-1 at 5–9, 11–12.). The two cases were consolidated for discovery and trial. (*Id.* at 59.)

Before trial, Collier filed two motions to suppress. In the first motion, Collier contended that his March 9 statement was coerced and obtained in violation of his *Miranda* rights. (Doc. 32-1 at 14.) The trial court granted the motion in part, finding that Collier's confession was voluntary but that there had been a *Miranda* violation. (Doc. 32-2 at 38–39.) The court suppressed the first part of Collier's confession, which pertained to the March 3 assault, because it was given before Detective Avenetti provided *Miranda* warnings. (*Id.* at 39.) The court refused to suppress the second part of Collier's confession, relating to sexual abuse, because Collier had given it after voluntarily waiving his *Miranda* rights. (*Id.* at 39–40.)

The state later sought reconsideration of the trial court's suppression order. It argued that the *Miranda* warnings provided by Deputy Almodova on March 5 had carried over to the March 9 interrogation, such that the first part of Collier's confession was obtained constitutionally. (Doc. 32-2 at 193–97.) Collier responded that the motion should be denied because there was no evidence that he had heard or responded to the warnings. (*Id.* at 201.)

The trial court issued a written order granting the motion, allowing Collier's full statement to be presented at trial. (*Id.* at 254–57.) The order contains factual errors: it states that Deputy Almodova advised Collier of his *Miranda* rights before asking questions about the March 3 assault, although the warnings were given after Collier confessed; it also states that Collier expressly waived his rights and agreed to speak to Deputy Almodova, although the record showed that Collier did not respond to the warnings. (*Id.* at 112–13, 254–55.) Collier's counsel did not seek reconsideration of the order or otherwise bring these errors to the trial court's attention. (Doc. 32-4 at 122–23.)

In the second motion, Collier again sought to have his March 9 statement suppressed, this time based on an alleged violation of *Edwards v. Arizona*, 451 U.S. 477 (1981). (Doc. 32-2 at 46.) Collier argued that he had invoked his right to counsel near the time of his arrest on March 5, and that it was a violation of *Edwards* to subject him to further interrogation on March 9 without giving him an attorney. (*Id.* at 50–51.) The trial court denied the motion, finding that Collier had not clearly and unequivocally invoked his right to counsel. (*Id.* at 182.)

Collier was convicted of all charges except for one count of sexual conduct with a minor. (Doc. 32-3 at 15–17.) The trial court sentenced Collier to a combination of concurrent and consecutive terms of imprisonment totaling 180 years. (*Id.* at 47.) Collier appealed. (*Id.* at 68–69.) As relevant here, Collier argued that his March 9 statements were coerced, and that it was a constitutional violation to admit them at trial. (*Id.* at 121–26.) The Arizona Court of Appeals corrected a minor sentencing error but otherwise affirmed, and the Arizona Supreme Court denied review. (*Id.* at 208–32, 273.)

## IV.    Post-conviction Proceedings

Collier filed a petition for post-conviction relief in July 2010 and a "supplemental" petition in September 2013. (Doc. 32-4 at 2, 118.) As relevant here, Collier argued that his trial counsel was ineffective for overlooking the strongest objections to the admissibility of his confessions. Collier contended (1) that he was arrested without probable cause on March 9; (2) that law enforcement trespassed onto the curtilage of his house on March 9;

- 4 -

1    (3) that his Sixth Amendment right to counsel was violated when he was interrogated on

2    March 9 without an attorney present; (4) that the trial court erred in concluding that the

3    *Miranda* warnings given on March 5 had carried over to the March 9 interrogation; and (5)

4    that his Fourth Amendment rights were violated when Deputy Almodova entered the

5    nonpublic area of his family-owned business on March 5. (Doc. 32-4 at 21–29; 121–48,

6    152–56.)

7          The trial court summarily denied Collier's claims, finding he had not demonstrated

8    that his counsel's performance fell below an objective standard of reasonableness.

9    (Doc. 32-5 at 127–29.) The Arizona Court of Appeals similarly disposed of Collier's

10   claims, summarily finding that Collier had not demonstrated deficient performance. (*Id.*

11   at 189.) The Arizona Supreme Court denied review. (*Id.* at 214.)

12         Collier initiated this action on May 10, 2018, and filed the operative first amended

13   petition on January 3, 2019. (Docs. 1, 30.) He raises six claims. These include the

14   voluntariness claim rejected during Collier's direct appeal, as well as the five claims of

15   ineffective assistance of counsel rejected during Collier's state post-conviction proceeding.

16   Respondents raise no issues concerning timeliness, cognizability, or procedural default.

17                                **Legal Standard**

18         The petition is governed by the Antiterrorism and Effective Death Penalty Act of

19   1996 ("AEDPA") because it was filed after April 24, 1996, AEDPA's effective date.

20   *Murray v. Schriro*, 745 F.3d 984, 996 (9th Cir. 2014). Under AEDPA, federal habeas relief

21   may be granted on a claim that was denied on the merits in state court only if the denial

22   "was contrary to, or involved an unreasonable application of, clearly established Federal

23   law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or

24   "was based on an unreasonable determination of the facts in light of the evidence presented

25   in the State court proceeding," *id.* § 2254(d)(2). In determining whether a petitioner has

26   satisfied § 2254(d), federal courts look to the "last reasoned state court decision." *Balbuena*

27   *v. Sullivan*, 980 F.3d 619, 629 (9th Cir. 2020).

28         Under § 2254(d)(1), a state court decision is "contrary to" Supreme Court precedent

"if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A state court decision "involve[s] an unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. For purposes of the "unreasonable application" clause, the determinative inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable," not whether it was merely incorrect or erroneous. *Id.* at 409, 412.

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). A federal court may grant relief based on an unreasonable determination of fact only if "an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Pizzuto v. Yordy*, 947 F.3d 510, 523 (9th Cir. 2019) (per curiam) (quoting *Murray*, 745 F.3d at 999).

**Ineffective Assistance of Counsel**

**I.     Legal Principles**

A petitioner asserting a claim of ineffective assistance of counsel must show both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish deficient performance, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. In considering whether counsel was deficient, federal courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. To establish prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in

the outcome." *Id.* at 694.

Review of ineffective-assistance claims under § 2254(d) is "doubly deferential" because "*Strickland* instructs courts to review a defense counsel's effectiveness with great deference, and AEDPA requires federal courts to defer to the state court's decision unless its application of Supreme Court precedent was objectively unreasonable." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (first citing *Strickland*, 466 U.S. at 689; and then citing *Renico v. Lett*, 559 U.S. 766, 773 (2010)). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

## II.     Discussion

Collier raises five claims of ineffective assistance of counsel. He argues that his claims should be reviewed de novo because the state court failed to analyze them using the principles set forth in *Strickland*. This argument is without merit. Citing to *Strickland* (and to state court decisions which cite *Strickland*), the Arizona Court of Appeals held that Collier failed to establish that his counsel performed deficiently. (Doc. 32-5 at 189.) This was an adjudication of the merits of Collier's claims, and it is entitled to AEDPA deference. 28 U.S.C. § 2254(d). Because the state court did not explain its holding, the Court considers "what arguments or theories . . . could have supported" its determination that Collier failed to meet his burden. *Richter*, 562 U.S. at 102.

### A.     Illegal Entry and Seizure (Ground One)

Collier contends that his Fourth Amendment rights were violated when Deputy Almodova entered the nonpublic backroom of his family-owned business without consent or a warrant. He argues that counsel was ineffective for not objecting to his March 5 statement as a product of these violations. However, the Arizona Court of Appeals could reasonably conclude that counsel was not deficient because counsel could have reasonably determined that a Fourth Amendment challenge lacked merit.

It is well-established that consent is an exception to the Fourth Amendment's

protection against unreasonable searches and seizures. *United States v. Mendenhall*, 446 U.S. 544, 557–60 (1980). Whether a consent "was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances and is a matter which the Government has the burden of proving." *Id.* at 557 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 227 (1973)). Here, the prosecution would have proven that the encounter was consensual. Deputy Almodova was alone and made no threats or show of force. There were no facts indicating that Collier, a 36-year-old male, was somehow susceptible to coercion. The encounter occurred not at a stationhouse but at Collier's place of employment. It was midmorning, and Collier's mother and other members of the public were close nearby. According to the trial court, there were no signs of coercion present on the audio recording.[2] (Doc. 32-2 at 183.) To the contrary, the court observed that Collier was "very free about speaking to the officer." (*Id.*) The court also noted that the tone of Collier's and Deputy Almodova's voices indicated that the encounter was "pretty low-key." (*Id.* at 184.)

Collier suggests that there was coercion because Deputy Almodova was wearing a uniform and carrying a firearm, among other items typically carried by law enforcement officers. However, it is widely known that "[o]fficers are often required to wear uniforms" and that "most law enforcement officers are armed." *United States v. Drayton*, 536 U.S. 194, 204–05 (2002). Thus, unless the officer brandishes his or her firearm—which did not occur here—these factors "have little weight in the analysis." *Id.* Collier also refers to the fact that he was not informed that he could refuse Deputy Almodova's request to speak outside. But "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." *Schneckloth*, 412 U.S. at 227. These circumstances, without more, do not establish that Collier was coerced.

Collier concedes that his counsel investigated by doing a walkthrough of the store

---

[2]   The trial court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1); *see Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2001) (stating that the presumption of correctness applies to factual findings made by both the trial court and the court of appeals).

and listening to Collier's description of the encounter. (Doc. 30 at 16–17.) Based on that investigation, counsel could have reasonably determined that a Fourth Amendment challenge lacked merit because the encounter was consensual. The Arizona Court of Appeals could reasonably conclude that counsel was not deficient for failing to raise this meritless objection. *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018) (per curiam) ("A fairminded jurist could conclude that counsel's performance was not deficient because counsel reasonably could have determined that the motion to suppress would have failed.").

### B.   Inadequate *Miranda* Warnings (Ground Three)

Collier contends that the trial court erred in reversing its determination that a portion of his March 9 statement was obtained in violation of *Miranda*. He argues that the court's amended decision was based on factual findings that are either wrong or unsupported by the record, and that counsel was ineffective for not alerting the court to these errors in a motion for reconsideration. However, the Arizona Court of Appeals could reasonably conclude that counsel was not deficient because counsel could have reasonably determined that a request for reconsideration would have been futile.

Collier is correct that the trial court's written order contains factual errors. The order states that Deputy Almodova recited the *Miranda* warnings before questioning Collier about the March 3 assault, but the warnings were given after Collier confessed. (Doc. 32-2 at 112–13, 254–55.) However, counsel could have reasonably refrained from objecting to this error because it was immaterial to the question before the trial court, i.e., whether Collier heard and understood the *Miranda* warnings. The trial court could have answered in the affirmative regardless whether the warnings were provided before questioning or several minutes later, after Collier had made incriminatory statements.

The order also states that Collier expressly waived his rights and agreed to talk, but the record shows that Collier did not respond to the warnings. (*Id.* at 113, 255.) This error is perhaps more consequential: While an express waiver of rights would prove conclusively that Collier heard the warnings, Collier's nonresponse was consistent both with the finding that Collier heard the warnings *and* Collier's contention that he did not. However, despite

what the order says, the trial court was clearly aware of Collier's position. In a written

response to the state's motion, counsel argued that the *Miranda* warnings were inadequate

because Deputy Almodova "recited them while driving and facing forward," and because

there was "no indication on the recording that [Collier] heard" or responded to them. (*Id.*

at 201.) Counsel raised these points again at the motion hearing, and the court expressly

agreed that whether Collier heard the warnings was "contest[ed]." (*Id.* at 241–42.)

As counsel had twice presented Collier's version of the events, and the trial court

had expressly acknowledged that there was a factual dispute, counsel could have

reasonably determined that the error in the court's order was immaterial to the court's

ultimate conclusion that the warnings had carried over to the March 9 interrogation. The

Arizona Court of Appeals could reasonably conclude that counsel was not deficient for

failing to seek reconsideration.

Collier's claim would also fail under de novo review because he cannot establish

prejudice. Collier was charged with two counts of aggravated assault. One count was based

on the theory that Collier, a person who was at least 18 years old, assaulted A.C., a person

who was under the age of 15 years old. (Doc. 58-14 at 34.) The other count was based on

the theory that Collier assaulted another person causing temporary disfigurement,

including a fracture of any body part. (*Id.*) Here, even if the second confession had been

re-suppressed, the remaining evidence at trial showed beyond a reasonable doubt that

Collier was guilty under both theories.

There was no dispute that Collier hit A.C. with a small, hard object: During a

recorded conversation on March 5, Collier admitted he hit A.C. in the face with a "metal"

object; Collier testified at trial that he threw a "steel tube" in A.C.'s direction out of anger

and "hit her in the face"; and A.C. testified at trial that Collier hit her in the face with a

marijuana pipe. (Doc. 58-4 at 70; Doc. 58-6 at 50–51; Doc. 58-11 at 67–68.) Collier at all

times denied intent to hit and injure A.C., but the prosecution did not need to prove intent

to cause injury; it was sufficient to show that Collier acted "recklessly," i.e., that, in

throwing the steel object in A.C.'s direction, Collier was "aware of and consciously

disregard[ed] a substantial and unjustifiable risk" that injury would occur. (Doc. 58-14 at 32–34.) As to the first theory, there was no dispute that Collier and A.C. were in the applicable age ranges. As to the second theory, the provider who treated A.C. testified that an x-ray showed that A.C.'s nose was fractured. (Doc. 58-5 at 10–13.)

Given this evidence, there is no reasonable probability that re-suppression of Collier's second statement would have resulted in a more favorable outcome at trial.

### C.    Invocation of Right to Counsel (Ground Four)

Collier argues that he invoked his Sixth Amendment right to counsel during his initial appearance for aggravated assault, and that he was deprived of that right when he was interrogated on March 9 without an attorney present. He argues that the failure to raise this objection constituted ineffective assistance of counsel. However, the Arizona Court of Appeals could reasonably conclude that counsel was not deficient because counsel could have reasonably determined that a Sixth Amendment challenge lacked merit.

As an initial matter, the Sixth Amendment is "offense specific" and "does not attach until a prosecution is commenced." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). As of March 9, 2004, no criminal prosecution had been initiated against Collier for sex offenses against A.C. As a result, his confession to those crimes was not suppressible under the Sixth Amendment.

Collier had, however, been charged with aggravated assault. Under the law applicable at the time, if a criminal defendant invoked his right to counsel during his initial appearance, the Sixth Amendment forbade the police from obtaining a waiver of that right during subsequent interrogations. *Michigan v. Jackson*, 475 U.S. 625, 636 (1986), *overruled by Montejo v. Louisiana*, 556 U.S. 778 (2009).[3] Collier argues that he invoked his right to counsel during his initial appearance by "inform[ing] the court he would retain counsel." (Doc. 30 at 32.) If this was indeed an invocation, then Collier's statements about the assault would have been inadmissible under *Jackson*'s bright-line rule.

---

[3]    Respondents argue that Collier's claim is contrary to *Montejo*. However, because *Montejo* was decided several years after Collier's convictions, it has no relevance to Collier's claim of ineffective assistance.

- 11 -

However, it was not clear that a defendant could invoke his right to counsel merely by informing the court that he intended to hire private counsel in the future. While some courts have held that this is enough, others have held that it is not. *See McMonagle v. Ne. Women's Ctr., Inc.*, 493 U.S. 901, 905 (1989) (White, J., dissenting from denial of certiorari) (stating that the Supreme Court should resolve the conflict between lower courts regarding whether a stated intent to hire counsel in the future is sufficient to invoke the Sixth Amendment right to counsel). The Supreme Court has suggested, and the Ninth Circuit has stated, that invocation requires either a request for court-appointed counsel or *actual* employment of a private attorney. *See Patterson v. Illinois*, 487 U.S. 285, 290–91 & n.3 (1988) (observing, in the context of a Sixth Amendment challenge, that it was "of some significance that petitioner had not retained, or accepted by appointment, a lawyer to represent him at the time he was questioned by authorities"); *United States v. Harrison*, 213 F.3d 1206, 1209 (9th Cir. 2000) (stating that "[a] defendant . . . invoke[s] the Sixth Amendment right by hiring a lawyer or asking for appointed counsel"). Here, Collier did neither prior to his interrogation.

Given the unclear state of the law, counsel could have reasonably doubted that Collier invoked his Sixth Amendment right to counsel and thus reasonably refrained from raising this objection. The Arizona Court of Appeals was not objectively unreasonable in concluding that the performance of counsel was not deficient. Furthermore, for the reasons stated in the preceding section, Collier's claim would fail under de novo review because he cannot establish that he was prejudiced by his counsel's alleged ineffectiveness.

**D.    Illegal Arrest (Ground Five)**

Collier contends that he was arrested without probable cause on March 9 when, in the early morning hours, he was handcuffed and transported to a substation for questioning. He argues that counsel was ineffective for not challenging his statement as a product of that illegal arrest. However, the Arizona Court of Appeals could reasonably conclude that counsel's performance was not deficient because counsel could have reasonably determined that Collier's arrest was supported by probable cause.

"Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Henry v. United States*, 361 U.S. 98, 102 (1959) (citing *Stacey v. Emery*, 97 U.S. 642, 645 (1878)). Whether probable cause exists depends on the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). If sufficiently detailed, the statement of a victim can alone suffice to establish probable cause. *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir. 2008); *Peng v. Mei Chin Penghu*, 335 F.3d 970, 978 (9th Cir. 2003).

On March 8, 2004, over a period of two hours, Deputy Vasquez obtained a lengthy, highly detailed statement from A.C. about the nature of Collier's abuse. A.C. stated, among other things, that the abuse started when she was seven years old and living with her mother; that the abuse included masturbatory contact, oral sex, and sexual intercourse; that the abuse occurred every weekend for years until she moved in with Collier, at which point it became much more frequent; that Collier never used condoms; and that Collier told her that she would "learn to like it," that "he love[d] [her] and that's what [they were] suppose[d] to be doing," that oral sex was her "way of proving [her] love to [him]," and that she "shouldn't be telling people" about the abuse. (Doc. 32-4 at 50–55.) A.C. also recounted, in considerable detail, a then-recent incident during which Collier tied her hands behind her back and her legs open before they had sexual intercourse. (*Id.* at 61–64.)

Counsel could have reasonably concluded that A.C.'s statement sufficed to establish probable cause. Collier resists this conclusion, suggesting that, as a matter of law, probable cause may not be based entirely on a victim's statement. This argument rests on a misreading of *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912, 925 (9th Cir. 2001), in which the court explained: "In establishing probable cause, officers may not solely rely on the claim of a citizen witness that he was a victim of a crime, but must independently investigate the basis of the witness' knowledge or interview other witnesses." An officer can "investigate the basis of the witness' knowledge" by probing the victim's account and obtaining details about the alleged crime. *Compare John*, 515 F.3d at 941 (holding that the statement of the alleged victim established probable cause

1   because the officer "probed [her] allegations thoroughly prior to arresting" the defendant),

2   *with Arpin*, 261 F.3d at 925 (holding that the alleged victim's brief, "unexamined charge"

3   did not establish probable cause for the defendant's arrest). Here, Deputy Vasquez

4   thoroughly examined A.C.'s allegations before Collier was arrested.

5          Collier points out that Detective Avenetti had doubts about the existence of probable

6   cause. (Doc. 32-1 at 152–53.) However, the standard for probable cause is objective; this

7   means that probable cause can exist despite an officer's subjective belief that it does not.

8   *Florida v. Royer*, 460 U.S. 491, 507 (1983); *Ewing v. City of Stockton*, 588 F.3d 1218,

9   1231 n.20 (9th Cir. 2009); *United States v. Moses*, 796 F.2d 281, 284–85 (9th Cir. 1986).

10  Next, Collier argues that there was no probable cause to re-arrest him for assault, which is

11  what Detective Avenetti initially claimed to be investigating. However, "[b]ecause

12  probable cause is an objective standard, an arrest is lawful if the officer had probable cause

13  to arrest for any offense, not just the offense cited at the time of arrest or booking." *District*

14  *of Columbia v. Wesby*, 138 S. Ct. 577, 584 n.2 (2018); *see Devenpeck v. Alford*, 543 U.S.

15  146, 153–55 (2004). There was probable cause to arrest Collier for sex offenses against

16  A.C., regardless of the offense cited at the time.

17         In the reply brief to the first motion to suppress, counsel observed that "[t]he officers

18  did not wait for a warrant" after interviewing A.C., "but instead went to Mr. Collier's home

19  in force." (Doc. 32-1 at 41.) As "[t]he Fourth Amendment requires that arrest warrants be

20  based 'upon probable cause,'" this remark is evidence that counsel believed there was

21  probable cause to arrest, and that an illegal-arrest challenge lacked merit. *Kalina v.*

22  *Fletcher*, 522 U.S. 118, 129 (1997) (quoting U.S. Const. amend IV). The Arizona Court of

23  Appeals was not objectively unreasonable in concluding that counsel's performance was

24  not deficient.

25     **E.    Trespass on Curtilage (Ground Six)**

26         Collier contends that law enforcement made an illegal, warrantless entry onto the

27  enclosed curtilage of his home on March 9. He argues that his statement, given later at a

28  substation, was the product of that illegal entry, and that his counsel's failure to raise this

objection constituted ineffective assistance of counsel. However, the Arizona Court of Appeals could reasonably conclude that counsel's performance was not deficient because counsel could have reasonably determined that Collier's stationhouse confession was admissible regardless of any preceding constitutional violation.

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477–78 (1971)). The curtilage is part of the home for purposes of the Fourth Amendment and thus receives the same protection. *Oliver v. United States*, 466 U.S. 170, 180 (1984). This protection, however, was "designed to protect the physical integrity of the home; it was not intended to grant criminal suspects . . . protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime." *New York v. Harris*, 495 U.S. 14, 17 (1990). Stated differently, "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*." *Id.* at 21.

Here, the record indicates that counsel reasonably believed there was probable cause to arrest Collier. Counsel could have also reasonably determined, pursuant to *Harris*, that Collier was in legal custody at the substation regardless of any preceding *Payton* violation, and that Collier's stationhouse confession was consequently admissible. The Arizona Court of Appeals was not objectively unreasonable in concluding that counsel's performance was not deficient.

**Voluntariness of Confession (Ground Two)**

**I.    Legal Principles**

A confession is involuntary under the Fifth and Fourteenth Amendments if the "defendant's will was overborne" by the police, taking into account "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth*

*v. Bustamonte*, 412 U.S. 218, 226 (1973)); *see Malloy v. Hogan*, 378 U.S. 1, 6–11 (1964). A finding of involuntariness requires the presence of "coercive police activity," *Colorado v. Connelly*, 479 U.S. 157, 167 (1986), but also of relevance is the length, location, and continuity of the interrogation; the defendant's maturity, education, physical condition, and mental health; and the police's failure to provide the defendant with *Miranda* warnings, *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993) (citations omitted).

"[T]he ultimate issue of 'voluntariness' is a legal question requiring independent federal determination." *Miller v. Fenton*, 474 U.S. 104, 110 (1985). But although the state court's voluntariness determination is not entitled to AEDPA deference, the "[f]act-finding underlying the state court's decision is accorded the full deference of [§ 2254(e)(1)]." *Kirkpatrick v. Chappell*, 950 F.3d 1118, 1133 (9th Cir. 2020) (second alteration in original) (quoting *Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004)).

## II.   Discussion

Collier contends that his confession was the product of psychological coercion. The trial court rejected this argument and held, based primarily upon the video of the interrogation, that Collier's confession was voluntary under the totality of the circumstances. (Doc. 32-2 at 28–38.) The Arizona Court of Appeals adopted the trial court's findings in large part and affirmed based on its own review of the video.[4] (Doc. 32-3 at 222–25.) For the following reasons, the court of appeals' decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based upon an unreasonable determination of the facts.

As an initial matter, the state courts made factual findings that are entitled to a presumption of correctness. *See Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2001)

---

[4]     Although the state courts cited only to Arizona caselaw, Arizona courts apply the same voluntariness standard as federal courts. *See State v. Smith*, 974 P.2d 431, 436 (Ariz. 1999) ("'Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' . . . .'" (quoting *Connelly*, 479 U.S. at 167)); *State v. Walton*, 769 P.2d 1017, 1024 (Ariz. 1989) ("To determine the voluntariness of a confession, the court must evaluate the 'totality of the circumstances' surrounding the confession." (first citing *Schneckloth*, 412 U.S. at 226–27; and then citing *Fikes v. Alabama*, 352 U.S. 191, 197 (1957))). Because "the state-law rule subsumes the federal standard," Collier's "federal claim may be regarded as having been adjudicated on the merits." *Johnson v. Williams*, 568 U.S. 289, 301 (2013).

(stating that the presumption of correctness applies to factual findings made by both the trial court and the court of appeals). These include, among other things, that Detective Avenetti made no threats or promises, and that Collier had a cooperative demeanor and showed "no signs of fatigue." (Doc. 32-2 at 30–32); *see Rupe v. Wood*, 93 F.3d 1434, 1444 (9th Cir. 1996) (holding that the state court's determination that the police made no threats or promises "was essentially a factual conclusion, which is entitled to a presumption of correctness"). Collier has offered nothing to rebut the presumption. In any event, the Court has reviewed the video of the interrogation. The Court agrees, regardless of any deference required under AEDPA, that the state courts' findings are correct, and that Collier's confession was voluntary under the totality of the circumstances.

The interrogation was broken into two parts, each lasting approximately 40 minutes. The first part concerned the circumstances leading up to the March 3 assault. Collier explained that he was frustrated with A.C.'s absences at school, academic performance, and behavior with boys. He also described being concerned that A.C. was hiding things from him and being untruthful when he confronted her. According to Collier, these issues came to a head on March 3, when he became angry and threw a small pipe at A.C., hitting her in the face.

The second part concerned A.C.'s allegations of sexual abuse. Detective Avenetti read Collier his *Miranda* rights prior to asking any questions, and Collier stated that he understood his rights and would answer questions. Collier initially denied each of the allegations. However, when told that A.C.'s bedsheets would be tested for the presence of his semen, he admitted that "some things happened a couple times." Collier was reluctant to provide details, but he eventually confessed to having frequent sexual contact with A.C., including fondling, oral sex, and sexual intercourse. He also explained the reason for his conduct, stating that it was not a "weird thing" associated with A.C.'s young age, but rather a "love thing" because she was "so special" to him.

The video shows that Collier's will was not overborne. He became emotional at times while discussing his concerns about A.C.'s behavior, but he otherwise maintained a

calm demeanor throughout the interrogation. He showed no signs of fear or intimidation. Although he mentioned that he had not slept much since being released from jail, he showed no signs of fatigue. He was eager to discuss the circumstances leading up to the March 3 assault, so much so that Detective Avenetti spoke very little during that part of the interrogation. Collier spoke clearly and at length, leaning forward and gesturing with his hands as he talked, and he presented documents to Detective Avenetti that supported what he was saying. While he was more subdued during the second part of the interrogation, his responses to Detective Avenetti's questions remained clear and calm. Additionally, there is no reason to believe that the *Miranda* warnings were not effective: They were given before Collier was aware of the sexual abuse allegations, and Collier acknowledged that he understood each individual *Miranda* right before agreeing to answer questions.

This was a one-on-one interview; Collier was not "surrounded by multiple officers" or "subjected to 'tag team' questioning." *Balbuena v. Sullivan*, 980 F.3d 619, 633–34 (9th Cir. 2020). Detective Avenetti made no threats or promises. In fact, Collier's first incriminatory statement about the sexual abuse was made in response to the suggestion that his semen might be found on A.C.'s bedsheets, not in response to a purported threat or promise. Furthermore, Collier did not merely parrot back the allegations recounted by Detective Avenetti. He denied that certain allegations were true (e.g., that A.C. approached him about a pregnancy scare, and that the abuse had been going on for seven years) and volunteered information that was beyond the scope of the immediate question (e.g., it was a "love thing" rather than a "weird thing").

Collier points to other factors as contributing to an unduly coercive atmosphere. He complains that the interrogation occurred in the early morning hours at an unmarked residential structure, not at a clearly marked stationhouse; that he had not slept or eaten much before the interrogation; and that the interrogation occurred in a small, windowless room with Detective Avenetti sitting in front of the exit. These are appropriate factors to consider, and they may have weighed in Collier's favor if the record were limited to just

testimony. However, the video shows that despite these circumstances, Collier maintained a calm demeanor and exhibited no signs of fear, intimidation, or fatigue. *See Balbuena*, 980 F.3d at 634 ("[T]he video recording of Balbuena's interview . . . is dispositive and supports the state court's conclusion that Balbuena voluntarily confessed.").

Collier has not overcome the strictures of 28 U.S.C. § 2254(d). "A habeas petitioner meets this demanding standard only when he shows that the state court's decision was 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Dunn v. Madison*, 138 S. Ct. 9, 11 (2017) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). Here, the state court identified and applied the correct totality-of-the-circumstances test. In doing so, it considered a variety of appropriate factors and made reasonable findings. A fairminded jurist could conclude that the court's decision was correct. Moreover, Collier's claim fails under de novo review because his confession was voluntary under the totality of the circumstances.

Therefore,

**IT IS RECOMMENDED** that Petitioner Lon Fredrick Collier's first amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 (Doc. 30) be **denied** and **dismissed with prejudice**.

**IT IS FURTHER RECOMMENDED** that a certificate of appealability be denied because Petitioner has not made a substantial showing of the denial of a federal constitutional right, and jurists of reason would not find the Court's assessment of Petitioner's constitutional claims "debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

This recommendation is not immediately appealable to the United States Court of Appeals for the Ninth Circuit. The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the district court. The parties shall have fourteen days within which to file responses to any objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). No replies may be filed absent

prior authorization by the district court. Failure to file timely objections may result in the acceptance of this recommendation by the district court without de novo review. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc). Filed objections should use the following case number: **No. CV-18-01442-PHX-RCC**.

Dated this 16th day of February, 2021.

Honorable Maria S. Aguilera
United States Magistrate Judge